[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-13866

Non-Argument Calendar

_____

CINDY EDWARDS,

Plaintiff-Appellant,

*versus*

WELLSTAR MEDICAL GROUP, LLC,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cv-04492-MHC

_____

Before WILSON, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Cindy Edwards appeals the district court's summary judgment for WellStar Medical Group on her claim that the company failed to accommodate her disability, in violation of the Americans with Disabilities Act.  After a thorough review of the record and the parties' briefs, we affirm.

## FACTUAL BACKGROUND

Edwards joined WellStar in 2013 as an "office supervisor." Three years later, in 2016, Edwards applied for—and received—a promotion to be an "office manager" in WellStar's Powder Springs office.

As an office manager, Edwards was responsible for overseeing the office's day-to-day operations.  Edwards described the "essential functions" of her position as the "coordination of operations of the practice and staff meetings; supervision of patient scheduling, billing, [and] medical records; monthly financial reports; and managing staff performance."  As office manager, Edwards reported to Adewale Adebayo (her direct supervisor) and to Amber Thomas-Hutson (Adebayo's supervisor).

In 2015, Edwards began seeing a licensed clinical social worker, Robert Bryant, for "major depression recurrent with anxious stress."  In October 2017, Edwards took leave under the Family and Medical Leave Act for anxiety and stress.  She returned to work about four months later in February 2018.

WellStar required employees returning from a leave of absence to be cleared to return. Edwards's therapist only cleared her to return to work for four hours per day during her first thirty days back. So Edwards asked Joey Hunt—WellStar's Vice President of Human Resources—for this work schedule as an accommodation under the Americans with Disabilities Act. Hunt approved Edwards's request.

When Edwards returned to work, Adebayo—her direct supervisor—questioned her about her new schedule. After Edwards confirmed that she was limited to a four-hour workday, Adebayo asked her to email him the dates that she would be out of the office. He also asked her what type of illness she had. In response, Edwards filed a complaint about Adebayo and stated that she felt that "her safety [had been] compromised." Because Edwards had reported that she did not feel safe in the workplace, Hunt placed her on paid administrative leave while he investigated her complaint.

In March 2018, while Edwards was out on paid administrative leave, Thomas-Hutson decided to transfer Edwards to the "soon to be opening medical office on Prestley Mill Road," where Edwards would have the same position with the same salary and benefits. Thomas-Hutson concluded that the transfer would "allow Edwards a fresh start at another practice." Because the Prestley Mill Road office wasn't scheduled to open for a few months, Thomas-Hutson decided that, in the meantime, Edwards would "have some capacity and therefore would also be assisting [Thomas-Hutson] and Adebayo on the PCORI [Patient Centered

Outcomes Research Institute] project." PCORI is an entity that funds projects aimed at improving health care.

On March 16, Edwards emailed Hunt, asking for an update on her complaint. She asked if she could return from paid administrative leave to "rebuild trust with [her] team uninterrupted." Hunt responded that Edwards would remain on paid administrative leave pending the investigation into her complaint.

Weeks later, on April 9, Hunt met with Edwards to discuss the results of his investigation. He concluded that Adebayo hadn't committed any wrongdoing and closed the investigation. Hunt also told Edwards about her temporary reassignment to the PCORI project—which was being run by Adebayo and Thomas-Hutson— and explained that she would then become the office manager of a new WellStar office when it opened. Edwards was unhappy with the transfer and told Hunt that she felt that the PCORI project "was an unsafe place to be for [her]" under Adebayo's and Thomas-Hutson's management.[1] Hunt did not provide any specifics about

---

[1] On top of her complaint against Adebayo, Edwards also filed a complaint against Thomas-Hutson. The previous year, after a survey revealed that the Powder Springs Medical Center staff had much lower employee morale than other WellStar branches, Thomas-Hutson conducted a focus group with the staff to find out why. The employees complained about Edwards's leadership style. Despite being barred from attending, Edwards allegedly questioned employees about what they said at the focus group. After Thomas-Hutson confronted Edwards about her inquiries, Edwards filed a complaint about Thomas-Hutson's "unprofessional behavior." An investigation found no wrongdoing.

what Edwards would be doing at the PCORI project. Instead, Hunt said that he would set up a meeting between Edwards, Adebayo, Thomas-Hutson, and himself to discuss next steps.

The next day, Edwards followed up with Hunt, emailing him that she couldn't meet with Adebayo or Thomas-Hutson because of her health condition.[2] At this point, Edwards retained an attorney and told WellStar to direct all future communications to her counsel.

At some point in mid-May, Edwards called Hunt to ask for an accommodation—specifically, to transfer supervisors. She submitted a letter from her therapist stating that "[s]he would benefit from being reassigned to a similar position on another team."

On May 21, Edwards met with Hunt and representatives from human resources to discuss Edwards's request to be assigned to a new team. At the meeting, they "discussed the PCORI project, [with Edwards] still asking for the job description and what [she'd] be doing. [They] also discussed a transfer to anywhere other than the PCORI project." Edwards offered to take a pay cut to transfer but she never applied to transfer to another location. Other than transferring supervisors, Edwards didn't ask for any other accommodations. She again told Hunt that she could not work with Thomas-Hutson or Adebayo because of their unprofessional behavior. That same day, Edwards tried to go back to the office to

---

[2] She also filed a complaint against Hunt for his "improper investigation."

work—because her paid leave had ended—but Hunt sent her home.

Days later, on May 25, Hunt told Edwards that transferring supervisors was not a reasonable accommodation and that, "[i]f there [was] a different accommodation [she] would like to request," then Edwards should submit it "by June 1" or else WellStar would "make a decision" about her employment based on the information she had previously provided.

Edwards replied later that day, telling Hunt that, "[i]f [she was] to remain under the management/supervision of [her supervisors], [she] respectfully ma[de] the following reasonable accommodation request."   Edwards then listed eighteen accommodations (which we've reproduced below):

- [1] Telecommuting and/or working from home.(On an as needed basis only due to medication side effects)
- [2] Part-time work hours, job sharing, adjustments in the start or end of work hours(as needed to due to medication side effects )
- [3] Sick leave for reasons related to mental health, flexible use of vacation time, additional unpaid or administrative leave for treatment of recovery, leaves of absence and/or use of occasional leave (a few hours at a time) for therapy and other related appointments.
- [4] Breaks according to individual needs rather than a fixed schedule, more frequent breaks and/or greater flexibility in

scheduling breaks, provision of backup coverage during breaks, and telephone breaks during work hours to call professionals and others needed for support.

- [5] Reduction and/or removal of distractions in the work area.
- [6] Tape recorders for recording/reviewing meetings and training sessions.(due to medication side effects and symptoms of my health condition)
- [7] Modification or removal of non-essential job duties or restricting of the job to include only the essential job functions.
- [8] Division of large assignments into smaller tasks and goals.
- [9] Additional assistance and/or time for orientation activities, training and learning job tasks and new responsibilities.(based on my individual needs)
- [10] Additional training or modified training materials.(based on my individual needs)
- [11] Implementation of flexible and supportive supervision style; POSITIVE reinforcement and feedback; adjustments in the level of supervision or structure, such as more frequent meetings to help prioritize my daily tasks; and open communication DIRECTLY with supervisors regarding performance and work expectations.
- [12] Additional forms of communication and/or written and visual tools, including communication of assignments

and instructions in my preferred learning style (written, or e-mail demonstration)creation and implementation of written tools such as daily 'to-do' lists, step-by-step checklists, written (in addition to typed minutes of meetings).

- [13] Regularly scheduled meetings (weekly) to discuss workplace issues and productivity, including annual discussions as part of performance appraisals to assess abilities and discuss promotional opportunities/performance deficiencies.

- [14] Development of strategies to deal with problems BEFORE they arise.

- [15] Written work agreements that include any agreed upon accommodations, long-term and short-term goals, expectations of responsibilities and performance standards.

- [16] ALL meetings must be scheduled with at least a week prior notice. The meeting agenda and attendees must be disclosed at the time the meeting is scheduled.

- [17] Any cancellation, rescheduling or postponing of meetings will need to be done so in writing with explanation at least 24hrs in advance.

- [18] There will be no behavior or violation of the code of conduct of any kind that will exacerbate my mental health condition.

Edwards listed eighteen accommodations because she didn't know what her new job responsibilities at the PCORI project would be and wanted to let WellStar "pick the ones that wouldn't

be a hardship." Edwards admitted, though, that she copied the eighteen accommodations from "the ADA website," even though her therapist had only ever recommended that she change supervisors.

On June 5, Hunt responded that he didn't understand whether Edwards was requesting all of the accommodations or whether some subset of them would be sufficient. He also said it was unclear how the accommodations would help her mental health condition. He further noted that "many of her requests [were] non-specific." To that end, Hunt asked Edwards to identify which accommodations she was requesting and to explain how those accommodations would allow her to perform in light of her health condition. Hunt asked Edwards to respond by the next day.

Edwards replied a few hours later, explaining that she was requesting accommodations "to allow [her] to maximize [her] productivity." She explained that she had recently been diagnosed with "major depressive disorder w[ith] anxious stress," which was causing her to experience sadness, sleep disturbances, and related symptoms. She said she was also taking medication that caused her to feel groggy. Edwards listed the same accommodations from her May 25 email almost verbatim, adding that she wasn't certain whether she would remain as an office manager at the Powder Springs office or whether she would move to the PCORI project. Edwards asked for more time to re-acclimate if she was going to stay at the Powder Springs office or for more time to orient to a new position at the PCORI project.

In her email, Edwards also linked some of her requested accommodations to her depression and anxiety. She noted, for example, that: (1) due to her anxiety, she wanted meetings to be scheduled with a week's notice; (2) due to her depression and anxiety, she wanted 24 hours' notice of any meeting's cancellation, rescheduling, or postponement; and (3) due to her depression, she wanted there to be "no code of conduct violations of any kind that w[ould] exacerbate [her] mental health condition." Edwards concluded by asking Hunt to let her know if he needed medical documentation of her disability or need for accommodations and that she "looked forward to meeting with [him] to discuss options for accommodating [her] disability."

On June 8, a few days later, Hunt responded that Edwards's requests were "unduly burdensome, impractical, [and] disruptive." He noted, for instance, that it wasn't feasible to schedule all meetings a week in advance. More than that, he continued, "many of the requested accommodations are too general to implement in any meaningful way." So, Hunt concluded, he couldn't grant her request. And because Edwards had multiple opportunities to identify a set of reasonable accommodations and had not done so, Hunt "concluded that no such accommodation exists." He terminated her employment.

## PROCEDURAL HISTORY

After her termination, Edwards sued WellStar for violating the Americans with Disabilities Act because WellStar committed "[a]ctual [d]iscrimination and [f]ailure to [a]ccommodate in

[v]iolation of the [Americans with Disabilities Act]."[3]  In her complaint, Edwards alleged that, although she asked for accommodations (in her May 25 and June 5 emails), WellStar refused to meet with her, hid the essential functions of her new position, and denied her accommodations.  Edwards also claimed that WellStar refused to engage in the "interactive process" required by the Americans with Disabilities Act.

WellStar moved for summary judgment.  WellStar construed Edwards's complaint as asserting two claims—one for failing to accommodate her disability and one for failing to engage in the Act's "interactive process."

As to Edwards's failure to accommodate claim, WellStar contended that transferring supervisors was not a reasonable accommodation.  And her other proposed accommodations were either non-specific, not reasonable, or would require changing the essential functions of the office manager position.

As to Edwards's interactive process claim, WellStar contended that it was not an independent claim and that, even if it was, it failed because there was no genuine dispute that WellStar had worked with her in good faith and provided multiple opportunities to identify a reasonable accommodation.

---

[3] Edwards also asserted claims under the Family and Medical Leave Act and for "regarded as" discrimination and retaliation in violation of the Americans with Disabilities Act.  Because Edwards does not appeal the summary judgment for WellStar on those claims, we don't discuss them further.

Edwards responded in several ways. As to the failure to accommodate claim, Edwards argued that she satisfied all elements of the cause of action. As relevant here, Edwards argued that there was a factual dispute over whether her requested accommodations were reasonable because Hunt, at his deposition, admitted that ten of the eighteen requests could be implemented. Edwards also claimed that she didn't intend for WellStar to grant every request, which is why she had told Hunt that she looked forward to meeting with him to discuss "options."

As to her interactive process claim, Edwards conceded that it was not an independent claim. Still, she argued that several facts showed that WellStar had failed to accommodate her and was responsible for the breakdown in the interactive process. For example, she pointed to: WellStar's failure to identify the essential functions of the PCORI position, its refusal to identify any possible positions to transfer to, its decision to impose short deadlines on her to respond, and its refusal to meet with her in response to her June 5 email.

The district court entered summary judgment for WellStar. As to the failure to accommodate claim, the district court concluded that "[b]ecause [Edwards] has failed to clarify what accommodation(s) she needed to address her disability, she has failed to show that her requested accommodations were reasonable[.]" The district court rejected Edwards's argument that some of her accommodations were reasonable, explaining that she hadn't "identified

which accommodations she needed to appropriately address her disability and that would permit her to do her job."

As to the "failure to engage in the interactive process" claim, the district court concluded:

> It is clear from a *de novo* review of the record that there was a long history of [WellStar] considering and granting many of [Edwards's] ADA work accommodation requests. It is also clear from the record that [WellStar] specifically considered [Edwards's] May 21, 2018, request for different supervisors, rejected it, but invited [Edwards] to propose an alternative accommodation. [Edwards] responded on May 25 with a voluminous list of generic requests that were cut and pasted from a website and did not appear to be related to her health condition or tailored to her job function. Nevertheless, [WellStar] asked [Edwards] for clarification as to which requests she needed to accommodate her health condition and requested an explanation as to how the requested accommodations would allow her to perform her work considering the health condition. Instead of clarifying her request, [Edwards] sent another, largely repetitive, laundry list of cut-and-pasted requests without any explanation. Based on this record, no reasonable juror could conclude that [WellStar] cut off the

interactive process regarding the reasonable accom-
modation of [Edwards's] disability.

Edwards appeals the summary judgment for WellStar on her
Americans with Disabilities Act claims.

## STANDARD OF REVIEW

We review de novo a district court's grant of summary judg-
ment, "viewing all evidence, and drawing all reasonable inferences,
in favor of the non-moving party." *Vessels v. Atlanta Indep. Sch.
Sys.*, 408 F.3d 763, 767 (11th Cir. 2005). A party is entitled to sum-
mary judgment if she can show "that there is no genuine dispute as
to any material fact and [she] is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a).

## DISCUSSION

On appeal, Edwards argues that a reasonable jury could find
for her on her failure to accommodate claim and her interactive
process claim.[4] We take each in turn.

---

[4] Edwards also argues that we should revive her "actual discrimination"
claim—that is, her claim that WellStar violated the Americans with Disabilities
Act by firing her because of her disability. But neither side addressed this
claim before the district court. The claim is therefore forfeited. *See Johnson
v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001) (explain-
ing that, when a party "move[s] for final summary judgment," the non-mov-
ing party must "rais[e] in their opposition papers any and all arguments or de-
fenses they felt precluded judgment in [the moving party's] favor").

*Reasonable Accommodation*

The Americans with Disabilities Act provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability" in any terms, conditions, or privileges of employment. 42 U.S.C. § 12112(a). To prevail on a disability discrimination claim, a plaintiff must show that: "(1) she is disabled, (2) she was a qualified individual when she was terminated, and (3) she was discriminated against on account of her disability." *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016). We'll focus our attention to the third element: discrimination.

"An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide reasonable accommodations for the disability—unless doing so would impose undue hardship on the employer." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001) (cleaned up); *see also* 42 U.S.C. § 12112(b)(5)(A) (providing that discrimination includes "not making reasonable accommodations . . . , unless . . . the accommodation would impose an undue hardship" on the business). "The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000).

But what is a reasonable accommodation? For one thing, we've said that "[a]n 'accommodation' is 'reasonable'—and, therefore, required under the ADA—only if it *enables* the employee to

perform the essential functions of the job." *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) (emphasis added); *see also* 29 C.F.R. § 1630.2(o)(1)(ii) (defining a reasonable accommodation partly as an action that "enable[s] an individual with a disability who is qualified to perform the essential functions of that position"). To "[e]nable" means "to make someone able to do something" or "to make something possible." *Enable*, Cambridge English Dictionary Online (2022). In other words, a plaintiff must show that the accommodation is *necessary*—in that the accommodation "make[s] [it] possible" for her to do her job. *Id.* The corollary is that, "[i]f an employee does *not* require an accommodation to perform her essential job functions, then the employer is under no obligation to make an accommodation, even if the employee requests an accommodation that is reasonable and could be easily provided." *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020) (emphasis added).

Edwards hasn't shown that she needed an accommodation. Viewed in the light most favorable to Edwards, the office manager's essential functions were: "coordination of operations of the practice and staff meetings; supervision of patient scheduling, billing, [and] medical records; monthly financial reports; and managing staff performance."[5] But Edwards admits that she could do all of these things without accommodations. In her final

---

[5] The parties agree that the relevant position is the office manager position, not the PCORI project position.

accommodations request, for example, Edwards said she was asking for her long list of accommodations—not because she needed them—but because they would "maximize [her] productivity." Consistent with that, Edwards performed the essential functions of the office manager role for two years without accommodations, even after she began treatment with Dr. Bryant in 2015. Even Edwards concedes that she "had been performing in the position and a similar position for five years before she was terminated and still could perform the essential functions of her position." Consistent with this admission, Edwards tried to come back to work, in May 2018, without *any* accommodations.

Although Edwards listed eighteen accommodations in her letter to Hunt—some of which WellStar admitted it could reasonably provide—she didn't identify any specific accommodations and explain how those accommodation would "enable" her to perform the essential functions of her job. *See Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998) ("[A] plaintiff does not satisfy her initial burden by simply naming a preferred accommodation—even one mention in the statute or regulations; she must show that the accommodation is 'reasonable' given her situation."); cf. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008) (holding, in the housing context, that a city "cannot be liable for refusing to grant a reasonable and necessary accommodation if the city never knew the accommodation was in fact necessary" (cleaned up)). For an accommodation to be reasonable, it must "enable" Edwards to perform her job. 29 C.F.R. § 1630.2(o)(1)(ii). Even on

appeal, though, Edwards hasn't explained which accommodations she needs—not merely wants. And it's "incumbent on the plaintiff[], not the defendant[] or the court, to identify where [she] wanted partial relief, if full relief [was] not possible." *Onishea v. Hopper*, 171 F.3d 1289, 1305 (11th Cir. 1999). In the end, this is fatal to Edwards's claim.

In sum: a reasonable accommodation is one that "enable[s] an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1(ii). Because Edwards was able to perform the essential functions of her job without any accommodation, she didn't need an accommodation to "make [it] possible" or "enable" her to perform them. Put another way, because she was already capable of doing the job, she did "not require an accommodation to perform her essential job functions" and Wellstar was thus "under no obligation to make an accommodation." *D'Onofrio*, 964 F.3d at 1022. For this reason, WellStar didn't violate the Americans with Disabilities Act by denying Edwards's accommodations requests.

### Interactive Process

Edwards's interactive process claim also fails. The Equal Employment Opportunity Commission's regulations provide that, "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). But we've held that, "where a plaintiff cannot demonstrate 'reasonable

20-13866          Opinion of the Court          19

accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant." *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997).  Edwards failed to show that she requested any reasonable accommodation.  As a result, WellStar had no obligation to initiate an interactive process.

**AFFIRMED.**